[No. 3203.]

Ex PARTE W. W. PACE.

HABEAS CORPUS—EVIDENCE.—See the statement of the case for evidence in
a habeas corpus proceeding for bail under a charge of murder, *held* in-
sufficient to authorize the refusal of bail.

HABEAS CORPUS on appeal from a judgment refusing bail on a
hearing in chambers by the Hon. T. B. Wheeler, judge of the
twelfth judicial district. The appellant was held under a *mit-
timus*, issued by a justice of the peace, charging the murder of
William Gilson.

The case was opened by the submission of the testimony ad-
duced on the examining trial. A. J. Roy was the first witness
sworn for the State on that trial. He testified that the deceased
was shot by some one, he did not know who, in witness's saloon
in Sweetwater, on the night of May 7, 1884. Witness, who had
been standing behind his bar, had just got into a back room,
some twelve or fourteen feet from the entrance of the bar room,
when the shooting commenced. The defendant, the deceased,
old man Edmond and Mr. Cooksey were in the bar room when
the shooting occurred. Deceased was standing three or four
feet from the end of the bar, leaning on the counter, talking with
Cooksey. The defendant was standing still, between the east
end of the pool table and the southeast door. Witness went
back into the bar room as soon as the shooting was over, but
saw no one there but the deceased, who was reeling. Witness
saw no one go out of the bar room.

A short time before the shooting began, the defendant stepped
up to the bar, asking Cooksey what he would take to drink.
Cooksey declined to drink, and the defendant then said that he
would drink nothing. Defendant thereupon stepped back from
the bar, and Cooksey turned and spoke to the witness, saying:
"Al., Mack told me to say to you that he would not be back
until morning." Gilson, referring to Mack, said: "D—n him,
he is down on the street drunk." Cooksey replied: "No, he is
not; he has gone to Abilene. I went to the train with him, and
he told me to tell Al. that he would not be back until morning."

Gilson replied: "Jim, I would not believe you nowhere." To this Cooksey replied: "You do not have to believe me." Gilson said: "It is just this way: In shaking dice, gambling, or anything of that kind, I would not believe you at all. If you was to give me your honor and tell me anything, I would believe you as quick as any man in the world." Cooksey said in reply: "I haven't got any honor, and you don't have to believe me. I think I am the fastest man in Sweetwater." Witness started out of the room at this time, and as he was going heard Gilson say: "I did not aim to insult you." Cooksey said: "You have thrown that up to me often enough. You are always throwing up to me that you would not believe me." The defendant did not change his position as the witness went out, that the witness noticed.

On cross-examination, the witness described the construction of the house in which the homicide occurred, as follows: There were two doors in the front end of the building, one a single door, near the southeast corner, and the other a double door, about the centre. There was a window near the northeast corner of that end. The bar room was eighteen by twenty or eighteen by twenty-two feet in size. The bar counter was on the north side, and near the east end. The pool table stood about the center of the house, but a little nearest the south wall. The east end of the pool table was about ten feet from the east wall. From that end of the pool table to the southeast door, the distance was about ten feet. That door had a common panel shutter or screen. There were two such shutters to the double door. They all swung open to the inside.

When witness went out of that room Gilson was standing three or four feet from the east end of the bar and seven or eight feet from the east wall; Cooksey was west of Gilson and near the centre of the bar, and the defendant stood to the left of Cooksey, some twelve or fourteen feet from the east and about opposite the west end of the pool table. Just after he and Cooksey refused to drink, the defendant moved away toward the southeast door and corner. That door was closed. Considering the positions occupied by the defendant and Cooksey, egress through the southeast door was the safest for a man who expected Cooksey and Gilson to go to shooting. Defendant seemed to be in a good humor, and spoke kindly when he invited Cooksey to take a drink. Witness did not know whether or not he

included Gilson in the invitation. Witness had known the defendant about Sweetwater for two or three weeks.

On re-direct examination the witness stated that he did not know the character of business pursued by the defendant in Sweetwater. He did not know whether or not the southeast door was fastened when the shooting occurred. Witness could not say exactly how many, but thought six or eight shots were fired, nor could he say whether but one or two pistols were fired. Witness had examined the shot holes in the house and was satisfied that they could not have been made by a pistol fired by the hand of a man shooting from the position occupied by the defendant when the witness left the room. The deceased changed his position while the witness was in the back room. Witness saw blood all around the pool table. All of the shot holes discoverable were in the east, west and south walls. When witness came back into the bar room, the deceased was between the bar and the pool table, and nearest the east wall. He fell just as the witness came back. Witness did not know whether or not he then had a pistol. A. J. Whitsel was the first man, after witness, who entered the bar room after the shooting.

Re-crossed, the witness said that he did not know whose body supplied the blood he saw around the pool table. When the witness returned the deceased was four or five feet south or southwest from where he was when witness went out, but was still north of the pool table. The defendant could not, in the position he occupied when witness left, have shot the deceased in his changed position and made the holes in the wall.

A. J. Whitsel's testimony was next read by the State. He testified, in substance, that he was in his house, nearly opposite Roy's saloon, on the evening of the homicide. Between seven and eight o'clock he heard first one, and after a slight interim, three or more shots fired in rapid succession. Another short intermission preceded two or three more shots. During the firing of the second volley the witness heard one ball strike Dulaney's house, and immediately another strike his own house. About the time that the firing ceased, the witness heard Gilson speak in Roy's saloon, and started across to the saloon. When witness got within ten feet of the saloon he saw a man step from the walk into the moonlight with a pistol in his right hand, which he presently stuck down the left side of his pants. The man then walked rapidly down the street toward the Palace hotel. That man, the witness thought, was the defendant.

When this man had reached a point just below the Central hotel, sheriff Bardwell came up and asked witness what was the matter. Witness replied that Gilson was shot, and, pointing to the retreating figure of the defendant, said: "There goes the man who did the shooting.". Bardwell followed the defendant, and witness went into the saloon. He found Gilson on the floor, struggling to get up. Witness asked Roy to get a drink of water and a blanket on which to remove Gilson to the hotel. On raising Gilson up, the witness found a pistol under his head or neck. This pistol witness kept in his hand until he delivered it to Bardwell, with the exception of a moment at the Palace hotel, when Harry Hord examined it. One chamber of the pistol had been discharged. The next time the witness saw the man, or the person he took to be the man who stepped out of Roy's saloon with a pistol in his hand, was in the court house. Witness could not positively identify the defendant as that man, but he looked like him. The pistol he had in his hand on leaving the bar room was a bright, new looking weapon.

Cross-examined, the witness stated that he did not leave his house until the shooting ceased. He saw no one fire a shot, but saw smoke emerging from the bar room double door through the latticed shutters. The man who passed out pushed the shutters open from the inside. He did not ask the witness which way Cooksey went. Witness saw no one but that man at the time, and at no time saw old man Edmond go out of the saloon. When witness asked Gilson if he was hurt he, Gilson, said: "I will get over it."

The testimony of sheriff Bardwell was next read by the State. His statement was, in substance, that as soon as he heard the shooting, he ran from his house to Roy's saloon, near which he met Whitsel, and asked him what was the matter. Whitsel replied that Gilson was either killed or badly wounded, and pointed to the retreating figure of a man, who he said did the shooting. The witness followed and overtook the man, who proved to be the defendant, just as he stepped on the gallery of Johnson's saloon. He arrested the defendant, after telling him that he was sheriff. He asked defendant if he was armed, and the defendant said that he was not. Defendant requested permission, and was allowed, to step into Johnson's saloon to see Johnson. Johnson was not in, and witness took the defendant to the front of Roy's saloon and stopped, when some one said: "That man is armed." Witness found a pistol stuck down be-

tween the waistband of his pants on his left side, and said to defendant: "I thought you told me you was not armed." Witness then took defendant to jail. Defendant's pistol was a forty-five calibre, white handled, nickel plated Colt's revolver. Three shots had been recently fired out of it. The cartridge shells were still in the unloaded chambers.

J. D. Dulaney's testimony was next read. His statement was, in substance, that the defendant came into his store house on the night of the shooting, a short time before it occurred, and said that he wanted to exchange pistols with the witness for the night, as his was too long to carry in his pants. Witness told him he had only new pistols. Defendant said that he would not harm it in any way, and would return it next morning. Witness then got a new white handled, nickel plated Colt's forty-five calibre revolver, which, on request of defendant, he loaded and handed the defendant. Defendant gave witness his pistol, and went out. Within five or ten minutes, the witness heard shooting in Roy's saloon. Two or three bullets fell on witness's gallery. After the shooting, witness walked over to Roy's saloon and saw Gilson. He was down and shot. Witness then noticed but one wound on the body, about two and a half inches below the left nipple, but afterward examined and found four wounds on the body, the one described, one below it several inches, one in the right side, and one in the left wrist, all passing entirely through. Witness afterward saw the defendant in front of the saloon in sheriff Bardwell's custody. Six or seven shots were fired in all, and the witness thought that more than one pistol was used. Witness knew nothing about who did the shooting. Two or three parties were in witness's store when defendant came in and exchanged pistols. Witness afterward got his pistol from Bardwell.

F. G. Thurmond testified that he and defendant were together in Gray's saloon on the evening that the homicide occurred. While teasing candidates who had been defeated at the recent city election, the defendant, speaking of pistols, said to witness: "I have two; I will stake you with one." The defendant did not give the witness a pistol. Witness had no recollection of ever having seen the defendant with a pistol. The conversation alluded to occurred about sundown. The parties were all drinking somewhat, but the defendant spoke in a jocular, good humored tone. Witness made a statement before the coroner's jury, which, unless he made some mistake, and he thought that

unlikely, was true. That statement, by consent, was read in evidence. It was, in substance, as follows:

" The witness, old man Bradley, Fred. Beall, J. R. Moore, —— Friday, Jim Cooksey, W. A. Gray and H. C. Hord were present at W. A. Gray's saloon on the evening of the homicide, before it occurred. After some one treated, the crowd passed out of the saloon to the porch. About that time Gilson, the deceased, came up. Gilson said to witness: 'You voted for Bough. You are a cute one. I am going to put you in the penitentiary (or I will bet you are in the penitentiary) in fifteen months.' Witness proposed to Moore to go up the street with him, when some one laughed and asked: 'Thurmond, did you hear that?' Gilson replied to the party: 'Yes, Thurmond heard it, and he understands it.' Witness answered: 'Oh, I don't think he means it.' The defendant said: 'Old Gilson asked me if I was not a secret detective, and I don't like him any way. I have got two (putting his hand to his side), and will stake you with one.' Witness wanted not to take it (a pistol?), and said: 'Come on, let's go and take a drink.' Defendant made some rough remark as Gilson walked across the street. The witness then went to the postoffice, where he saw Cowan, and told him the substance of what Gilson said, and that Gilson was 'tight.' "

W. C. Johnson testified, in substance, that on the night of the homicide, Gilson, defendant, Cooksey and Seaton were in his saloon. Gilson was talking to Seaton about the election. Defendant remarked that Gilson had given Thurmond a "racket" over at the other saloon (Gray's), and that Thurmond having no pistol, he, defendant, let Thurmond have his. This occurred about eight o'clock in the evening. Defendant appeared to be in his usual good humor.

J. W. Anderson testified that five or ten minutes before the shooting, the defendant and Cooksey left Johnson's saloon, laughing and talking in a pleasant, good humored manner.

W. C. Cummings, proprietor of the Central hotel, testified, in substance, that Roy's saloon was up the street from his, witness's, place. Johnson's saloon was down the street. A short time before the shooting, the witness saw a man he took to be the defendant pass his house, going up the street, and shortly saw him return, going down the street. Within a few minutes he saw the same man and Jim Cooksey pass up the street together, and presently he heard the shooting. Immediately after the shooting the defendant passed witness's house, going down

the street, and witness asked him who was hurt. Defendant replied that he did not know.

Fred. H. Beall testified that he saw the defendant at Gray's saloon between sundown and dark on the evening of the homicide. He said something about Gilson—something to the effect that Gilson appeared to be out of humor, and that he, defendant, did "not fancy his, Gilson's, ways, and did not like him." Thurmond was not then present. He had just left.

Tim. Flannery testified that just before the shooting commenced he was standing outside at the window, looking in at Roy's saloon. Gilson, Roy, defendant and Cooksey were in the saloon. Roy and Cooksey were talking, when Gilson said something, to which Cooksey replied, in substance, that Gilson need not believe him if he did not want to. Motions of the party indicated a fight, and witness went from the window to the stable across the way. As he left, Cooksey seemed to be reaching for his pistol, and Gilson seemed to be "going for" Cooksey. A shot was fired just as the witness turned from the window, and the bullet whistled by the witness. Witness did not see the discharge of any shot. Gilson was standing with his back to the window, his elbow on the counter, and his hand up to his face. Cooksey was at or near the far end of the counter. The defendant was some little distance out from the counter and between (about midway) the other two. Two shots were fired with some little intermission, and the others rapidly. Witness did not count the shots. Cooksey went out of the saloon first, and went up by Simpson's store. Defendant came out of the saloon very shortly afterwards, and went down the street, or maybe across the street. Cooksey said something when he left the saloon, but witness did not understand him.

H. G. Bardwell was again sworn. He stated that after the shooting Whitsel gave him a pistol, which he instantly and positively recognized as one used by Gilson ever since he, Gilson, had lived in Sweetwater. The pistol had one empty chamber, but witness did not think it had been lately discharged.

T. E. Dauthitt, county clerk, testified that he took the dying statement of the deceased. After the statement was made, deceased was asked several questions about the difficulty, and among them, witness thinks, whether or not the defendant was present and had anything to do with the trouble. He said, as well as witness remembered, that the defendant was present, but that Cooksey did the shooting. Witness did not think the

deceased said anything in his hearing implicating the defendant.

Edmond Dorch testified that he was in Roy's saloon just before the shooting occurred. He saw no one in there but Roy, Cooksey and deceased. Witness just got into his own door, six or eight feet distant from the saloon door, when the first shots were fired. He met Lon Barron going into the saloon as he went out. He first saw the defendant, a few minutes after the shooting, about the middle of the street, between the houses of witness and Dulaney. Witness saw no pistol about the defendant.

The substance of the testimony of Thomas Barron was that he went into the saloon just before the shooting commenced, meet·ing the negro Edmond Dorch, and one or two other persons going out. He saw Cooksey and the deceased near the bar talking, and a man near the billiard table, whom he supposed, though by no means certain, was defendant. That man said nothing and did nothing that witness saw, and displayed no pistol that witness saw. Witness got out of the house just as soon as he could, when the shooting commenced, without stopping to count the shots or to see who was shooting. Two men, in his opinion, did the shooting. He thought the discharges were too rapid to have been fired by one man.

Frank Baugh's testimony was in substance that when defendant first came to Sweetwater he sent for witness and exhibited his papers of appointment as a deputy sheriff and police officer, from the sheriff of Travis county, and the Adjutant General of the State. He said he was hunting some men charged with offenses. Witness knew one of the men, but did not know his whereabouts. Defendant told witness that he did not want his business known. Sheriff Hornsby, of Travis county, subsequently told the witness that if he got defendant out of this trouble he was going to retain him in his service.

The substance of the *ante mortem* statement of the deceased was that he told Cooksey he would take his word about any thing but gambling; that Cooksey replied: "You have said enough about that, and I am tired of it," and stepped back and drew his pistol; that he, deceased, caught the pistol and held it while Cooksey shot him four times; that at first he could have killed Cooksey if he had wanted to. That he drew his pistol but did not fire a shot. One chamber of that pistol was empty, but

was not fired that night. That he was "jabbed" by the whole party. That his death and "removal" was very much desired, as he knew too much about the career of Cooksey and Jep Clayton. That Bill Gray, Cooksey and Clayton had bribed, or at least they thought they had bribed him, to leave Colorado, when Clayton was in trouble. Witness habitually drank a great deal of whisky, but never got it "above his collar." He repeatedly asserted that his death and removal was desired by "them," because of his knowledge of the crimes of others. That he had been an officer for twenty-eight years, and had never broken the law. He had used some sixty dollars of the bribe money which, though it came from Clayton, was paid to him by Bill Gray. He had put a cipher on a ten dollar bill he received of that money, which bill was now in Charley DuBose's possession for preservation.

The substance of the testimony of W. C. Johnson was that he was present when the deceased made his statement just before his death. Some one asked him, deceased, in substance, if the defendant had anything to with the shooting. Deceased answered that Cooksey shot him. Throughout his statement he declared that Cooksey did the shooting. Witness did not hear him mention the defendant's name. Witness had known the deceased for seven or eight months. He had know the defendant since he came to Sweetwater, some two or three weeks before the shooting. He saw the two together very often. They appeared to be on the best of terms. Witness had never noticed the least evidence of hard feeling or malice between them. They were together in the witness's saloon on the evening of the shooting, and appeared perfectly friendly at that time.

The appointment of the defendant as deputy sheriff of Travis county, by M. M. Hornsby, sheriff, and his qualification as such, certified by the district clerk, were next introduced in evidence.

The defense next introduced in evidence the following document:

"DESCRIPTION LIST.

"The bearer is a member of Company B, Frontier Battalion. Name: W. W. Pace. Rank: Orderly. Age: Twenty-four. Height: Six feet. Color of hair: Dark. Color of complexion: Fair. Where born: Austin, Texas. Occupation: Sheriff. En-

listed when: April 18, 1884. Enlisted where: Austin, Texas. Enlisted by whom: W. H. King, Adjutant General.

"W. H. King,
"Austin, Texas,                                    "Adj't Gen'l.
"April 18, 1884."

"Note.—This description list, for identification, will be kept in possession of the ranger to whom it refers, and will be exhibited as a warrant of his authority as such, when called upon, and must be *surrendered to his company commander when discharged.*"

The defense next offered in evidence the following passes:

"Adjutant General's Office, State of Texas.
"To agents and conductors of the International and Great Northern, Missouri Pacific and Texas Pacific Railways:

"Pass W. W. Pace, Company B, Frontier Battalion, from Austin to Fort Worth.

"Approved:                            Austin, Texas, April 21, 1884.
"W. H. King,                                    John O. Johnson,
"Adjutant General.            Q. M. Frontier Battalion."

The second pass was similar, and called for passage from Fort Worth to Sweetwater and return.

D. C. Pace, the brother of the defendant, testified that the defendant's estate did not exceed four hundred dollars in value, and that he could not give excessive bail. This concluded the evidence taken before the examining court, and reduced to writing. The judgment of the examining court, remanding the defendant without bail, was next read.

Thomas E. Dauthitt was placed upon the stand by the applicant. He testified that he was at present county clerk, and had resided in the county of Nolan since 1881. He knew the people who had resided in Sweetwater during that time. Deceased had been about Sweetwater about six months when killed. Witness saw the defendant for the first time on that night, just after the shooting. He was then standing in front of Roy's saloon, in the custody of the sheriff. Witness took a pistol from the defendant and gave it to the sheriff. Three chambers had been recently discharged. Witness did not know whether the deceased and the defendant were personally acquainted with each other. In speaking of his troubles as a peace officer, the deceased had

spoken of Cooksey.  Witness knew Cooksey.  He saw a man he took to be Cooksey running, just after the shooting, and has never seen Cooksey since.  He saw Cooksey's wife and children take the west bound train about a week after the homicide.

J. W. Germany was the next witness for the applicant.  His testimony was confined to a description of the wounds on the body of the deceased.  The wounded hand of the deceased, and his coat, where one ball entered the breast, were powder burned.

The testimony of W. C. Johnson, the next witness, did not vary materially from his testimony as adduced before the examining court.  He had never known of hard feelings between deceased and defendant, or between deceased and Cooksey, and did not know whether or not deceased was a witness against Cooksey and Clayton for assault with intent to murder in Nolan county.

F. G. Thurmond, the next witness placed on the stand, repeated his former statement somewhat more in detail.  There was no material discrepancy between his present statement and his statement reduced to writing at the examining trial.  He had understood that Clayton and deceased were at enmity.  Cooksey and Clayton were related by marriage, and were intimates and business associates.  So far as he knew, deceased and Cooksey were friendly.  He had seen the two together often, and had seen them drink together.  When the defendant made the remark, "I have two and will stake you with one," the deceased must have heard it; witness is satisfied that he did, but he took no notice of it.  Parties at the time were being teased over defeats for town offices.  Such talk as that they would have to go out and herd sheep was indulged.  Some of the parties seemed to get mad.  Witness was retained as counsel for Clayton and Cooksey in their pending trials for assault to murder, and the deceased's name was appended to each indictment as a State's witness.

The defendant then introduced in evidence an indictment against Cooksey, charging him with an assault with intent to murder S. P. Hardwick, to which the names of deceased and Hardwick were appended as State's witnesses; also an indictment against J. L. Clayton, charging him with an assault with intent to murder W. C. Gilson, the deceased, to which the names of the deceased and others were appended as witnesses.

A. J. Roy was next introduced and sworn for the applicant. His statement concerning the shot holes in the walls was as fol-

lows: "There were five bullets shot into the walls of my saloon during that difficulty. One ball went through the west wall, about six feet from the floor, ranging a little upwards. Two balls went through the south wall—one about eight feet east of the southwest corner, and about two and a half feet above the floor. This ball struck the wall at about an angle of sixty degrees. The other bullet struck the wall about nine feet from the floor, about the center of the room, and ranged a little up. The shot was evidently fired by some one standing about the center of the bar. The shot that struck the west wall was evidently fired by some one standing about twelve feet from the west wall and near the east end of the pool table, and probably five feet from the bar. The bar and pool table are about ten feet apart. Two shots struck the east wall—one about five and a half feet above the floor, and about three feet from the southeast corner, and was evidently shot by some person standing some distance from the east wall, and north or northwest from the northeast corner of the pool table. The other shot through the east wall was about two feet above the floor, and five feet from the northeast corner, and near the east end of the bar. That shot was fired by a person standing near the bar and west of where it struck. These estimates of where the parties shooting stood are made from the general range indicated by the bullet holes."

Thomas E. Dauthitt was called by and testified for the State. He and others were standing in Taylor's drug store, nearly two hundred yards north of Roy's saloon, when the shooting occurred. As soon as the shooting was over, witness and the party stepped out to the gallery. Witness then heard, and partially saw, a man running from the scene of the shooting. When the man got near the north side of Simpson's store, he hallooed back: "Now, G—d d—n you, I got there, Eli." Witness thought then, and thinks yet, that that man was James E. Cooksey. Cooksey then lived east of Roy's saloon, and east of where the witness saw the man running.

H. C. Hord testified that he was present when Gilson made his dying statement. Deceased was asked in substance if Pace, the defendant, was present when the shooting occurred, and answered in substance that if the defendant was present, he, deceased, did not see him.

J. F. Otey testified that a short time before the shooting he was in Dulaney's store, when defendant came in and exchanged

his long pistol with Dulaney. He told Dulaney that his was too long and he wanted a short one that he could shoot quickly. Dulaney loaded the new pistol, handed it to the defendant, who left his long pistol and went out. The shooting occurred within the next five minutes.

Joseph Boone located himself in the neighborhood of Simpson's store about the time the shooting ceased. Shortly afterwards he heard a man running, and heard him say: "By G—d, I got there, Eli." He expressed no opinion as to who this party was.

L. J. Otey was again put on the stand and testified, in substance, that he saw defendant and Cooksey together a great deal on the day of the killing. They were together so much that the witness's attention was particularly attracted. From where the witness was at work on a scaffold at a new house, he saw the defendant and Cooksey go off together behind a shoemaker's shop and stay some time in close conversation. He could hear nothing they said. He saw them together that evening at Gray's saloon, after the election was over. The feeling between Gilson and Cooksey, when the former first came to Sweetwater, was not good, but witness thought they had got on better terms before the shooting. Witness had heard Cooksey speak lightly of Gilson. He had heard him say that he thought Gilson had been brought to Sweetwater to kill somebody. It was some time after dinner that witness saw Cooksey behind the shoemaker's shop.

W. A. Gray testified that during the afternoon of the day on which Gilson was killed, he, defendant, Cooksey, Moore and some one else took a drink of whisky from a bottle provided by some one in the rear of the shoemaker shop. Otey had been at work on a house near by, but witness did not know whether he was working there at that time or not.

Jeff. Dulaney testified that he and several others were deputized by the sheriff to look for and arrest Cooksey on the night of the shooting. They searched that night and several other days and nights, but never found him.

It was admitted by the State that Gilson's authority as deputy sheriff had been revoked about two weeks before the shooting, and by the defense that for several months up to that time he had been a duly authorized deputy sheriff.

*Cowan & Posey,* and *Rector, Moore & Thompson,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This is an appeal from the judgment of the Hon. T. B. Wheeler, judge of the twelfth judicial district, rendered in chambers, in vacation, refusing bail on an application for bail under a writ of *habeas corpus* made by applicant, this appellant, who was charged with the murder of one William Gilson. We have maturely considered the voluminous record sent up on this appeal, and in our opinion the court erred in refusing bail. Wherefore said judgment is reversed, and appellant will be admitted to bail upon his execution of bond, with good security, in the sum of eight thousand dollars, conditioned as the law directs.

*Reversed and bail granted.*

Opinion delivered June 14, 1884.